**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

FILED

SEP 30 2002

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| PEGGY M. DUNNAVANT, | } | |
| | } | |
| Plaintiff, | } | |
| | } | |
| v. | } | CASE NO. CV 00-B-2123-S |
| | } | |
| SOUTHERN NATURAL GAS COMPANY, | } | |
| EL PASO ENERGY CORPORATION, | } | |
| | } | |
| Defendants. | } | |

ENTERED

OCT - 2 2002

## MEMORANDUM OPINION

Currently before the court are Motions for Summary Judgment filed by defendant

Southern Natural Gas Company ("SNG") and defendant El Paso Energy Corporation ("El

Paso"). Plaintiff Peggy M. Dunnavant ("Dunnavant") asserts claims of gender-based

discrimination against defendants pursuant to Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and the Equal Pay Act, 29 U.S.C. § 206(d).

Upon consideration of the record, the submission of the parties, the arguments of counsel, and

the relevant law, the court is of the opinion that El Paso's motion is due to be granted and SNG's

motion is due to be granted in part and denied in part.

1

# I. SUMMARY OF FACTS[1]

## A. Plaintiff's Education and Work at SNG

After attending Jefferson State Community College, the University of Alabama, and Birmingham Southern, plaintiff earned a Bachelor of Science degree in accounting. (Pl. Depo. at 17.) After graduating, plaintiff worked in the accounting department at Alabama Power Company for about nine months. (*Id.* 18-20.) Next, plaintiff performed billing and collections work for a law firm for about one and a half years, and then worked for Southern Nuclear. (*Id.* at 20-22.) In October 1993, SNG, then a subsidiary of Sonat, Inc ("Sonat"), hired plaintiff as a Rate Analyst in its Rates Department at a salary of $30,000 per year. (*Id.* at 24-29, Pl. Aff. ¶ 1; Matthews Aff ¶ 2.)

The Rates Department is responsible for filing and negotiating rate cases and maintaining rates with the Federal Energy Regulatory Commission ("FERC"). (Pl. Depo. at 29-30; Morgan Depo. at 54.) A rate is the amount charged to a customer for the use and transportation of natural gas supplied by SNG. The FERC allows gas providers like SNG to make a certain amount of money on gas that flows through a given pipeline. (Pl. Depo. at 30.) The Rates Department performs volume and revenue analysis to assure that SNG is receiving the rates allowed by the FERC and to support petitions to the FERC for rate increases. (*Id.* at 30-31.)

In late 1994, plaintiff spoke with Morgan, her supervisor at the time, about her wish to work part-time rather than full-time so that she could help her ailing father with his Mercedes

---

[1]Although some statements of fact are disputed, the evidence is cited in the light most favorable to plaintiff, the non-moving party, and all reasonable inferences from admissible evidence are drawn in favor of plaintiff. *See e.g., Patrick v. Floyd Med. Ctr.,* 201 F.3d 1313, 1315 (11th Cir. 2000).

dealership. (Pl. Depo. at 110-113, Ex. 1; Outlaw Depo. at 133; Morgan Depo. at 100.)  In

January 1995, SNG agreed to allow plaintiff to work part-time. (Pl. Depo. at 114, Ex. 1.)  In

1995, plaintiff worked seventy-five percent of full-time work and received seventy-five percent

of her former salary. (*Id.* at 115.)  After 1995, at her request, plaintiff worked fifty percent of

full-time work and received fifty percent of her annual salary. (*Id.* at 110, 115.)  As a part-time

employee, plaintiff received benefits, but not full benefits.[2] (*Id.* at 118.)  As a part-time

employee, volume analysis comprised sixty percent, revenue analysis comprised twenty-five or

thirty percent, and miscellaneous work comprised ten-percent of her work. (*Id.* at 120.)  In April

1997, SNG promoted plaintiff to the position of staff rate analyst. (*Id.* at 118-19.)  Plaintiff's pay

increased as a result of the promotion, but her duties and responsibilities remained the same.

(*Id.*)

According to plaintiff, from 1995 to 1999, roughly fifty to sixty percent of her work and

job duties involved I.T.[3] volume analysis ("volume analysis"). (*Id.* at 71-72, 75-77, 119-20.)

Volume analysis entails reviewing customer bills in order to ensure that SNG collected the

correct rate for the gas customers used and to ensure that SNG collected enough money to stay

on budget. (*Id.* at 35-38.)  Plaintiff performed month-to-month and year-to-year comparisons of

the volume of gas that moved through a particular pipeline. (*Id.* at 38.)  If there was a significant

difference in volumes transported, then plaintiff determined the reason for the variance. (*Id.*)

---

[2] For example, plaintiff paid a portion of her medical insurance and received only a
portion of the vacation time afforded to full-time employees. (Pl. Depo. at 118.)

[3] "I.T." stands for intermittent gas transportation. (Pl. Dep. at 49.)

Variance could result from changes in contract rate, temperature, tariff, or number of customers. (*Id.* at 50-62.)

The other portion of plaintiff's work included revenue analysis, data response, hi-low factors, penalty studies, cost analysis, pipeline expansion, refunds, FT discounts, and tracking demand numbers. (*Id.* at 76-77.) Revenue analysis, which took up twenty-five to thirty percent of plaintiff's time, (*id.* at 120), involves consideration of the volume of gas transported multiplied by the contract rate and relevant surcharges to determine whether SNG is achieving the desired rate of return. (*Id.* at 77-79.) Performing data responses involves compiling information to support rate case testimony. (*Id.* at 82.) In early 1994, plaintiff worked on data responses for the 93-15 rate case.[4] (*Id.* at 81-83.)

During her employment at SNG, plaintiff's supervisors included Glenn Sheffield, Bill Morgan, Darryl Outlaw, and Pete Lucas. (Pl. Depo. at 28-29.) Sheffield testified that plaintiff's work was acceptable, and that "she performed what [he] had asked her to do." (Sheffield Depo. at 43.) Sheffield never disciplined plaintiff or had any conferences to discuss her job performance. (*Id.* at 44.) However, Sheffield noted that plaintiff did not take the initiative to "go beyond the routine tasks." (Sheffield Depo. at 43-44.) Lucas gave plaintiff an overall grade of 73% on the 1996-97 performance review and 79% on the 1997-98 performance review. (Lucas Depo. at 39-40.) Both Sheffield and Lucas testified that plaintiff's analysis lacked specificity and explanation for changes that were reported. (Sheffield Depo. at 72-74; Lucas Depo. at 47-48.) Sheffield did not ever tell plaintiff that he wanted more detail and does not

---

[4] According to plaintiff, SNG did not file another rate case until 1999 and data responses for that were not due until after she was terminated. (Pl. Dep. at 83.)

4

recall speaking with her supervisor about it. (Sheffield Depo. at 74.) Outlaw testified that

plaintiff "did not generally analyze the data . . . [but rather] generally tabulated the data."[5]

(Outlaw Depo. at 40.) Morgan testified that plaintiff performed the tasks he assigned her

adequately and that he had no complaints about the work she did for his group. (Morgan Depo.

at 67-68.) Although Tina Hardy, a Principal in the Rates Department, never supervised plaintiff,

(*see* Hardy Depo. at 8), she testified that plaintiff's work performance was above average, (*id.* at

30.) Hardy testified that plaintiff's work product was "[t]imely and very accurate," and that

there were no complaints about plaintiff's work product or about plaintiff in general in the Rates

Department. (*Id.* at 30-31.)

   Plaintiff sought to return to full-time work more than once. In 1996, after hearing that

someone was going to be brought in to work in the Rates Department, plaintiff, who at the time

was working part-time, told Greg Meyers that she could "pick up the slack so that the

department would not have to hire another individual." (Pl. Aff. ¶ 4.) After Morgan transferred

to the Accounting Department in 1996, plaintiff expressed an interest in a position in that

department. (Morgan Depo. at 114.) Though there were no part-time positions in the

Accounting Department, Morgan did not understand that plaintiff wanted full-time employment.

(*Id.* at 115-16.)

   Heath Deneke holds a mechanical engineering degree from Auburn University. (Deneke

Depo. at 5; Pl. Depo. at 165.) In September 1996, SNG hired Deneke as a full-time Rate Analyst

at a salary of $36,000 per year. (Deneke Depo. at 7-8, 29.) Outlaw testified that in 1996 SNG

---

   [5] According to Outlaw, analysis involves "looking [] for competitive reasons what
impacts the company, for rate purposes what impacts the company, and digging deep into
various things that might impact . . . ." (Outlaw Depo. at 42.)

sought someone with a mathematics or engineering degree, because there was a need for

someone with strong analytical skills. (Outlaw Depo. at 102-03.)  Outlaw testified that Deneke

was being paid "based off his degree and his expectations and paying for the market value of his

engineering degree." (*Id.* at 100.)  When asked why Deneke would have been hired straight out

of college making more an hour than plaintiff was, Sheffield testified that Deneke "was an

engineer, and normally, engineers were–the company had to pay more to engineers to attract

them to the company." (Sheffield Depo. at 86-87.)  Cindy Grimes, who has worked in the

Human Resources Department for SNG or a related company since 1995, (Grimes Aff. ¶ 1),

explained SNG's hiring policies:

> In recruiting and attracting who SNG considers to be the best
> qualified employees, SNG attempts to offer competitive salaries.
> The starting salaries for recent graduates with engineering degrees,
> MBAs, and law degrees, are generally higher than that of
> individuals with accounting degrees.  This was also true with
> SONAT and its subsidiaries.  Based on my ten (10) years of
> experience in Human Resources, this is also consistent with other
> companies in which I have worked.  This explains the difference in
> starting pay between plaintiff and Heath Deneke in that Heath had
> an engineering degree; whereas plaintiff had an accounting degree.
> Janelle Chambers . . . also had an engineering degree and this
> resulted in a higher rate of pay for her compared to employees
> without engineering degrees. . . . **In 1996, starting salaries at
> SNG for individuals with engineering degrees were $36,000,
> while starting salaries for individuals with accounting degrees
> were $26,500.**  This is regardless of the specific departments
> where they were assigned.

(*Id.* ¶¶ 2-4 (emphasis added).)

During his first year at SNG, Deneke conducted volume analysis and started learning

how to do rate design and cost of service impacts. (Deneke Depo. at 16.)  He spent time with

competitive analysis, was active in the Koch Gateways Rate Filing, and started working on a

study called the North American Gas Supply and Demand Model ("NARG"). (*Id.* at 16-17.)
Deneke "worked approximately forty percent of the time on learning or performing rate design,
ten percent on cost of service impacts, twenty percent on competitive analysis, twenty percent on
the NARG study and less than ten percent on volume analysis." (Deneke Aff. ¶ 2.) After his
first year, Deneke "began working approximately eighty percent of the time on the NARG study
for some period of time." (*Id.*) During his second year, Deneke's responsibilities increased.
(Deneke Depo. at 17.) He spent "a good bit of time on the NARG study" and "started getting
more in tune with rate design and kind of shifted from a learning mode to [] actual[ly]
performing more stringent analysis and coming up with different concepts and ways to do
things." (*Id.* at 17-18.)

    In March 1998, Deneke received a pay raise. (Outlaw Depo. at 120.) In July 1998,
Deneke received another pay raise and was promoted to the position of Rate Design Engineer.
(*Id.* at 120-21.) According to Sheffield, Deneke was the only individual at SNG to have this
position. (Sheffield Depo. at 31-32.) After the promotion, Deneke's "focus shifted." (Deneke
Depo. at 19.) He "began to do a whole lot more rate design studies . . . . [,] started doing
depreciation studies, [and] developing testimony for the rate case . . . ." (*Id.* at 20.) He also
continued to do volume analysis, rate design, cost of services analysis, competitive analysis, and
the NARG study. (*Id.* at 19-20.)

    From 1996 to 1999, Deneke's duties included performing cost classification studies, rate
design studies, depreciation studies, mileage impact studies, three-day peak analysis, and volume
analysis; tracking the movement of gas prices; conducting I.T. feeder studies, I.T. revenue credit
studies, G.R.I. studies, season rate design studies, zone matrix rate design studies, competitive

analysis, and impact studies on selling SNG facilities. (*Id.* at 25, 50-51, 54, 56-58; Deneke Aff. ¶ 3.) Often, Deneke's supervisors gave him general requests or assignments, and, on many occasions, Deneke exercised his own initiative when working. (Deneke Depo. at 82.)

Sheffield and the other managers within the department, including Outlaw and Lucas, made job and project assignments. (Sheffield Depo. at 81-82; Outlaw Depo. at 106; Deneke Depo. at 22.) In early 1999, Sheffield made job assignments for the rate case that SNG planned to file in August 1999. (Sheffield Depo. at 100.) Sheffield chose Deneke to prepare the depreciation testimony. (*Id.* at 101.) According to Sheffield, "an accountant would understand depreciation concepts and would know how to apply depreciation rates to plant balances to come up with depreciation expense, but what [SNG] needed in terms of someone, who was going to testify, was a much more thorough knowledge of all of the pipelines facilities, where they were located, gas reserves for the offshore facilities; those sort[s] of things." (*Id.* at 103.) Sheffield thought Deneke was best-suited to offer the depreciation testimony because of his engineering background and work experience in the depreciation program. (*Id.* at 104.)

After being selected, Deneke "researched previous testimony from other companies. [He] sought to just generally study the methodologies that [SNG was] incorporating and try to apply that to how [SNG's] system was set up, and . . . began running different types of studies . . . to kind of figure out which was the most defendable and accurate to [SNG's] interest." (Deneke Depo. at 60.) Deneke wrote his own testimony with the assistance of legal counsel and a consultant. (*Id.* at 60-61.) Deneke sought and received assistance from people in the department about the wording of his testimony. (*Id.* at 63.)

8

In March 1999, El Paso announced a merger with Sonat, SNG's parent company. (Matthews Aff. ¶ 2.)  According to plaintiff, Sheffield told the employees in the Rates Department that "he felt that [the] rates [department] . . . would not be affected because [it was] in fact in the middle of a rates case and he did not see [the department] losing anybody."  (Pl. Depo. at 154-55.)  After the merger announcement, plaintiff received information stating that part-time employees would be required to work a minimum of 75% of a full work week.  (Pl. Depo. at 186-88.)  On July 26, 1999, plaintiff sent an e-mail to Cindy Grimes in SNG's Human Resources Department asking whether she would be allowed to continue working part-time at 50% of a full work week, whether she would need to increase her work to 75%, or whether El Paso would sever part-time workers.  (Def. Resp. to Pl. Disc.)

Following the announcement of the merger, there was a general freeze on employee status changes.  (Matthews Aff. ¶ 3.)  El Paso management and Sonat management "agreed that, absent the mutual consent of the two companies, the employment status of employees was not to be changed."  (*Id.*)  As a result, "no part-time employees could change to full-time employment without a business reason that could be agreed upon by both companies."  (*Id.*)

In 1999 plaintiff volunteered to return to work full-time on several occasions.  (Pl. Depo. at 177-83.)  In January 1999, March 1999, and May 1999, plaintiff asked to return to full-time work.  (Pl. Aff. ¶ 6.)  SNG did not offer her a full-time job.  Plaintiff testified that "[a]t no time did anyone tell [her] that because of the merger, [she] could not come back to work full-time." (*Id.*)

Following the announcement of the merger, Chris Jackson, a supervisor in the Information Technology ("IT") Department told Janice Parker, Vice-President of Customer

9

Service, that "the dedicated technical assistance provided by IT to the Customer Services Department for its external customers would not exist when SNG became a subsidiary of El Paso." (Parker Aff. ¶¶ 1, 3.)  Jackson told Parker that to the extent that the Customer Services Department needed an employee dedicated to providing assistance to external customers, it needed to place an employee in the Customer Services Department.  (*Id.* ¶ 3.)  At this time, Ed Gandy, a part-time employee in the IT Department, was already spending the vast majority of his time assigned to the Customer Services Department to provide assistance.  (*Id.*)  Parker decided the Customer Services Department needed to continue to provide assistance to its external customers and needed a full-time employee to do so.  (*Id.* ¶ 4.)  Parker thought Gandy was best qualified for the position because he had worked on the system for months, assisted with its installation, and performed in the help-desk capacity.  (*Id.*)  Parker placed Gandy in the full-time position in June 1999.  (*Id.* ¶¶ 2, 4.)

On September 2, 1999, El Paso provided SNG and other Sonat companies with El Paso Performance Reviews to use in evaluating employees' job performances.  (Matthews Aff. ¶ 4.) El Paso provided training and education on the evaluation process because SNG had never before utilized these types of reviews.  (*Id.*)  SNG managers "were not told specifically how the results from the reviews were to be used."  (*Id.*)  An employee's overall rating was not given by a manager, but rather, "after the reviews were completed the information on the reviews was entered in a computer and assigned an overall rating based on the ratings assigned to each category."  (*Id.*)  Employees with higher overall performance reviews were considered "the most capable to employ" upon completion of the merger.  (Matthews Aff. ¶ 5.)

On August 18, 1999, plaintiff found Deneke's pay stub on the copy machine, discovering that Deneke's hourly pay was $22.28, while her hourly pay was only $19.02. (Pl. Depo. at 168-69.)  On or about September 5, 1999, plaintiff complained of the disparity in pay to her supervisor, Outlaw, and asked for a salary adjustment and back pay.  (*Id.* at 172-73; Outlaw Depo. at 112-13.)  According to plaintiff, Outlaw said "There are people at SONAT who have been here shorter lengths of time than I have that make more money.  So is the way of the world.  Get over it." (Compl., Ex. A.)  Plaintiff told Outlaw that "it was not his decision to make and to pass it up the ladder." (*Id.*)  On September 13, 1999, Outlaw informed plaintiff that she was being sufficiently compensated and would not receive a pay adjustment.  (*Id.*; Pl. Depo. at 173.)  On September 16, 1999, plaintiff filed an EEOC Charge against SNG alleging discrimination in pay and treatment on the basis of gender.  (Compl. ¶ 10, Ex. A.)

Outlaw completed a performance evaluation of plaintiff in September 1999.  (Outlaw Depo. at 140.)  The performance review, dated September 27, 1999, states that plaintiff is "easily distracted by outside interests, [and] talks with car customers on the phone while at work." (PX 29 at 1.)  The review also states that plaintiff "needs to pay more attention to detail." (*Id.*)  Outlaw testified that to the best of his recollection, he had never put any of these criticisms of plaintiff in writing prior to completing this evaluation.  (Outlaw Depo. at 153.)  Although Sheffield did not assist Outlaw in preparing the evaluation, he did review it.  (*Id.* at 158; Sheffield Depo. at 115.)

On September 29, 1999, plaintiff's attorney sent a letter to Pat Pope, SNG's General Counsel, informing him that she was representing plaintiff "with regard to her gender discrimination claim against" SNG.  (PX 35.)  Pope testified that he received the letter in

11

September 1999, and that he "gave [the letter] to Cindy Grimes in the Human Resources Department, [] and did not share it with anyone in the Rates Department." (Pope Aff. ¶ 2.) Pope does not state whether or not he shared the letter with individuals other than Grimes outside the Rates Department. (*See id.*) In her second affidavit, Grimes states that she did not show the letter to anyone in the Rates Department. (*See* Grimes Aff. II ¶ 3.)

On September 30, 1999, the EEOC sent a Notice of Charge of Discrimination to SNG's Chief Executive Officer. (Pl. Depo., Ex. 4.) The Notice identified plaintiff as the person filing the Charge, and included a copy of the Charge. (*Id.*) Matthews testified that Ralph Daily, formerly an employee of the Human Resources Department at SNG, received the Charge on October 13, 1999. (Matthews Aff. ¶ 9.)

Following completion of the merger in October 1999, (Compl. ¶ 24), Jim Cleary, SNG's Executive Vice President, with input from the Transition Team[6] headed by Bill Cope, Vice President of SNG, decided to eliminate the job of part-time Rate Analyst, which at that time was held by plaintiff. (Matthews Aff. ¶ 7.) No one in the Rates Department was on the Transition Team. (*Id.*) Matthews testified that "[t]o [her] knowledge, none of the individuals involved in [the decision to eliminate the part-time Rate Analyst position held by plaintiff] were aware of plaintiff's Charge of Discrimination or complaint to Darryl Outlaw or anyone else regarding pay." (*Id.*) On October 29, 1999, Brian Seas told plaintiff that her position was being eliminated. (Pl. Aff. ¶ 2.)

---

[6] Matthews's affidavit does not indicate who served on the Transition Team. (*See* Matthews Aff.)

In addition to the part-time Rate Analyst job held by plaintiff, two other jobs were eliminated in the Rates Department, including an Engineering Assistant job held by Sharon Kirkwood and a part-time Strategist position held by Debbie Upchurch. (Matthews Aff. ¶ 7.) Neither Kirkwood nor Upchurch were offered employment with SNG after the merger.[7] (*Id.*) After plaintiff's job was eliminated no part-time positions at the 50% level at which plaintiff worked existed in the Rates Department. (*Id.*) According to Matthews, approximately 850 employees lost their jobs as a result of the El Paso-Sonat merger. (Matthews Aff. ¶ 5.) Nine part-time jobs were eliminated and approximately 300 jobs were eliminated in the Birmingham area as part of the merger. (*Id.*)

Prior to the merger, Brian George worked as a full-time Senior Financial Analyst in the Corporate Planning and Development Department. (Matthews Aff. ¶ 8.) As part of the merger, his job was eliminated. (*Id.*) According to Matthews, Cleary and Jim Yardley, SNG's President, were impressed with George's job performance and did not want him to leave. (*Id.*) SNG wanted to retain people like George, who was a high performer and had an MBA. (*Id.*) Cleary placed George in the position of Principal in the Rates Department, a vacant position that had not been eliminated as part of the merger. (*Id.*) According to Matthews, George "was considered best qualified for [the job] based on his MBA degree, prior analytical job experience as a Senior Financial Analyst, strong past job performance, and as a result of the high opinion of Brian George's job performance held by Mr. Cleary and Mr. Yardley." (*Id.*) Effective December 1, 1999, George became a Principal in the Rates Department. (*Id.*)

---

[7] Upchurch was retained on a contract basis through Kelly Services. (Sheffield Depo. at 136.)

13

On February 16, 2000, plaintiff filed a second EEOC Charge alleging that SNG terminated her employment "in retaliation for filing an EEOC Charge . . . ." (Compl. ¶ 45, Ex. B.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgement, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III. DISCUSSION

### A. MOTIONS TO STRIKE

Affidavits filed in support of or in opposition to a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." FED. R. CIV. P. 56(e).  Supporting and opposing affidavits must be based on personal knowledge. *Pace v. Capobianco*, 283 F.3d 1275, 1278 (11th Cir. 2002) (citing Rule 56(e)).  "Rule 56(e)'s personal knowledge requirement prevents statements in affidavits that are based, in part 'upon information and belief'–instead of only knowledge–from raising genuine issues of fact sufficient to defeat summary judgment." *Id.* (citations omitted).  "Likewise, an affidavit stating only that the affiant 'believes' a certain fact exists is insufficient to defeat summary judgment by creating a genuine issue of fact about the existence of that certain fact." *Id.* (citations omitted).  An affidavit's blanket statement to the effect that the affiant has personal knowledge of the facts set forth therein is not sufficient to bring the affidavit within Rule 56(e)'s requirement that it be based on personal knowledge.  *Id.* (citation omitted)  Affidavits containing conclusory allegations without specific supporting facts have no probative value and are insufficient to preclude summary judgment. *See Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217(11th Cir. 2000).

#### 1.  Motion to Strike Portions of the Affidavit of Peggy Dunnavant

On August 10, 2001, SNG filed a Motion to Strike Portions of the Affidavit of Peggy Dunnavant.[8]  SNG argues that Paragraphs 8, 9, 13, 16, 17, 18, 19, and 20, of the Affidavit should

---

[8] This Motion will be referenced as "Mot. Strike Pl. Aff."

be stricken because they do not satisfy Federal Rule of Civil Procedure 56(e).  (Mot. Strike Pl.

Aff. at 2-3.)  SNG argues that Paragraph 21 should be stricken because "the information which

plaintiff relied upon in completing the chart is unknown and should have been attached and/or

described in Paragraph 21 to satisfy Federal Rule of [Civil] Procedure 56(e)."  (*Id.* at 3.)

In paragraph 8, plaintiff testified that:

> Southern Natural Gas, SONAT Marketing, SONAT Exploration,
> SONAT Services, and SONAT, Inc., constantly switched
> employees around.  A few examples include: Pat Pope replacing
> Jim Cleary as head legal counsel in the spring of 1999.  Cleary had
> been legal counsel for SNG and was promoted to SONAT, Inc.,
> Executive Vice President. Jim Molyan, who was the President of
> Southern Natural Gas was transferred to SONAT, Inc., and Brian
> Seas went from SONAT Services to Southern Natural Gas.  Prior
> to the merger, Brooks Henderson went from SNG to SONAT
> Marketing.

(Pl. Aff.¶ 8.)  SNG argues that "at paragraph 8, plaintiff makes conclusory allegations but

attaches no specific dates to the information to suggest that it has any bearing on the case.  The

events described could have occurred years before plaintiff's complaint as alleged in this

lawsuit."  (Mot. Strike Pl. Aff. at 2.)  The court agrees.  The first sentence is merely a conclusory

allegation that is not sufficiently supported by the remainder of the paragraph or other evidence

of record.  Because the third, fourth, and fifth sentences contain no specific dates, they are not

sufficient to support the premise that the operations of Sonat and its subsidiaries were

interrelated, and consequently there is no way to determine the relevancy of these assertions to

this case.  Furthermore, the affidavit states no grounds for concluding that plaintiff is competent

to testify on such matters.  This paragraph is due to be stricken.

In paragraph 9, plaintiff testified:

16

> On September 13, 1999, after complaining to Darryl Outlaw about
> the pay disparity between Deneke and me, I was told that I was
> being sufficiently compensated. On September 21, 1999, my
> attorney se[n]t a letter to Pat Pope, legal counsel for SONAT,
> advising him of my charge with the EEOC and to ensure that I
> would not be retaliated against based on my charge of
> discrimination.

(Pl. Aff ¶ 9.) Defendant argues that this paragraph should be stricken because "there is **no evidence** offered as to the date this letter was received by defendant or whether the individuals involved in the decisions complained of knew about the letter." (Mot. Strike Pl. Aff. at 2 (emphasis in original).) Because defendant concedes that it received the letter in September 1999, (*see* Pope Aff. ¶ 2), paragraph 9 will not be stricken.

Defendant argues that paragraphs 13 and 19 should be stricken, because "whether plaintiff was aware or not of defendant's pay practices with respect to Engineers, has no material basis to this lawsuit." (Mot. Strike Pl. Aff. at 2.)[9] Because SNG claims that it paid Deneke more than plaintiff because he has an engineering degree, (*see* Grimes Aff. ¶ 2.), plaintiff's statement in paragraph 13 of her Affidavit is relevant to the lawsuit and should not be stricken.

Defendant argues that paragraphs 17 and 18 should be stricken because they "are not specific enough to constitute admissible evidence." (Mot. Strike Pl. Aff. at 3.) These paragraphs, discussing pay disparities in the Rates Department and the IT Department at SNG, are due to be stricken. There is no indication when the events occurred. Plaintiff's testimony on its face is hearsay, and is irrelevant to the claims in this lawsuit.

---

[9]Paragraph 19 of plaintiff's Affidavit does not relate to plaintiff's knowledge of pay practices with respect to engineers. Therefore, defendant's argument as to this paragraph is without merit.

Paragraph 20, which states that "[plaintiff] never conceded to Mr. Davis in [her] deposition that [she] did not perform the majority of jobs performed by Heath Deneke," is due to be stricken, because it is not relevant. Plaintiff's judgment about what she did or not concede in her deposition has no bearing on the resolution of her lawsuit.

Paragraph 21 states that "[t]he chart, attached herein as Exhibit 'A,' was complied [sic] by me and reflects information that I have reviewed through this litigation. The char[t] indicates salary, raises, and bonus payout comparing me and Mr. Deneke." (Pl. Aff. ¶ 21.) Defendant contends that paragraph 21 and accompanying Exhibit A should be stricken, because "[t]he information plaintiff relied upon in completing the chart is unknown and should have been attached and/or described in Paragraph 21 to satisfy Federal Rule of [Civil] Procedure 56(e)." (Mot. Strike Pl. Aff. at 3.) Because affidavits without specific supporting facts have no probative value, *see Leigh v. Warner Bros., Inc.*, 212 F.3d at 1217, paragraph 21 and Exhibit A are due to be stricken.

### 2. Motion to Strike Affidavit of Terri C. Alsobrooks

SNG filed a Motion to Strike Affidavit of Terri C. Alsobrooks. SNG argues that the testimony should be stricken because plaintiff did not disclose Alsobrooks in her Initial Disclosures. The court concludes that Alsobrooks's testimony should not be stricken on this ground because plaintiff offered Alsobrooks's testimony to rebut SNG's articulated reason for paying Deneke more than plaintiff, and to rebut SNG's position that plaintiff and Deneke performed different job duties.

SNG argues that Alsobrooks's testimony should be stricken because it is merely opinion testimony that is not supported by any facts. Alsobrooks worked as a secretary in SNG's Rates

Department beginning in November 1994.  The following portions of Alsobrooks's testimony

are due to be stricken:

> 1.  Alsobrooks's testimony that she formed "the opinion the men
> were paid more than the women regardless of their education,
> experience, or time with the company," (Alsobrooks Aff. 2),
> because the Affidavit contains no factual basis for the opinion.
>
> 2.  All of paragraph three except the statement: "I heard Mr. Myers
> make a statement when making an assignment to a man that he
> could count on him because he would not have to leave early for
> his children," (Alsobrooks Aff. 3), because the remainder of the
> paragraph is not factually supported.
>
> 3.  All of paragraph four, because it constitutes only conclusory
> allegations unsupported by fact.
>
> 4.  All of paragraphs five through seven, because the testimony is
> unsupported by a factual basis and there is no basis for concluding
> that Alsobrooks is competent to testify as to the differences
> between accounting work and engineering work or whether a
> particular individual was performing accounting work or
> engineering work.

### 3. *Motion to Strike Affidavits of Pat Pope and Cindy Grimes*

Plaintiff argues that the Affidavits of Pat Pope and Cindy Grimes, which SNG submitted

attached to its reply brief, should be stricken because they were not timely.  SNG submitted these

affidavits in response to plaintiff's assertion that the individuals who decided to eliminate

plaintiff's position could have been aware that plaintiff had engaged in protected activity at the

time they made their decision.  Because the court can find no indication that SNG could have

reasonably anticipated plaintiff's assertion when it moved for summary judgment, this evidence

is not due to be stricken.

Plaintiff also argues that the additional evidence El Paso submitted with its reply brief

should be stricken.  The evidence consists of a web-site address and an SNG organizational

chart. Because these submissions are not introduced in admissible form, they are due to be stricken.

## B. EL PASO'S MOTION FOR SUMMARY JUDGMENT

Plaintiff alleges that El Paso is liable for gender-based discrimination pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and the Equal Pay Act, 29 U.S.C. § 206(d). El Paso may be liable under either statute if it is plaintiff's employer. *See* 42 U.S.C. § 2000e-2; 29 U.S.C. § 206(d). El Paso argues that it should be granted judgment as a matter of law on plaintiff's claims because it is not plaintiff's employer.

Plaintiff contends that El Paso exercised the requisite control over plaintiff's employment to be treated along with SNG as a "single employer" for the purposes of this lawsuit. (Pl. Opp. El Paso at 1-3.)[10] In support of her contention plaintiff presents evidence that Sonat, rather than SNG, paid her wages. (*See* PX 14-18.) Plaintiff's employment relationship was governed by policies of Sonat, not SNG. (*See* PX 32.) Prior to the merger, plaintiff's supervisor, Outlaw, completed an El Paso evaluation form to evaluate plaintiff's performance. (Outlaw Depo. at 140-41; Matthews. Aff. ¶ 4.) To determine whether plaintiff is an employee of a particular employer, courts have used two tests, the Payroll Method and the "Single Employer" test.

### 1. Payroll Method

Under one test called the "payroll method," in order for plaintiff to be an "employee," she must have an "employment relationship" with her employer, which is most readily demonstrated by the individual's appearance on the employer's payroll. *Owens v. S. Dev. Council, Inc.*, 59 F.

---

[10] Plaintiff's Opposition to El Paso Energy Corporation's Motion and Brief in Support of Motion [for] Summary Judgment will be referenced as "Pl. Opp. El Paso."

Supp. 2d 1210, 1214 (M.D. Ala. 1999) (citing *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 206-07 (1997)). In addition to appearance on the payroll, the individual must also be an employee of the employer under the "traditional principles of agency law." *Owens*, 59 F. Supp. 2d at 1214 (citing *Walters*, 519 U.S. at 211). The factors of the common law agency test include the hiring party's right to control the hired party, the source of the tools used, the location of the work, the duration of the relationship between the parties, and whether the hiring party has the right to assign additional projects to the hired party. *Id.*, 59 F. Supp. 2d at 1216 n.4.

Although plaintiff was never on the payroll at El Paso, (Matthews Aff. ¶ 2), plaintiff has presented evidence that she was on Sonat's payroll, (*see* PX 14-18). Because El Paso does not argue that a corporate entity that is the product of the merger of two prior corporations is not responsible for the liabilities of the prior corporations, plaintiff's evidence that she was on Sonat's payroll has some relevance.

However, plaintiff cannot show that she was an employee of Sonat or El Paso under traditional principles of agency law. There is no evidence that either El Paso or Sonat controlled plaintiff's work. There is no evidence that El Paso or Sonat, as opposed to SNG, had any involvement in hiring plaintiff or had any contractual relationship with plaintiff.

   2. *"Single Employer" Test*

Although a parent company is generally considered a separate corporate entity from its wholly owned subsidiary, *see Wood v. Southern Bell Telephone and Telegraph Company*, 725 F. Supp. 1244 (N.D. Ga. 1989), and SNG is a subsidiary of El Paso, (Matthews Aff. ¶ 2), if a parent company's control over its subsidiary is great enough, the parent may be treated as the employer of its subsidiary's personnel and the parent and subsidiary are treated as a "single employer," *see*

*Player v. Nations Biologics, Inc.*, 993 F. Supp. 878, 881 (M.D. Ala. 1997).  Under the "single employer" test, the court considers "(1) interrelation of operations, (2) centralized control of labor relations, (3) common management, (4) common ownership or financial control." *Lyes v. City of Riviera Beach, Fla.*, 166 F.3d 1332, 1341 (11th Cir. 1999) (quotation omitted).

    To establish interrelation of operations, plaintiff must, for example, produce evidence of combined accounting records, combined bank accounts and lines of credit, and evidence of the sharing of services and employees.  *See, e.g., McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 933-34 (11th Cir. 1987).  Plaintiff's appearance on Sonat's payroll is insufficient to show that the companies' operations were interrelated.  Plaintiff's proffered evidence, a Human Resource handbook shared by SNG and Sonat and evidence that some employees left one company to work at the other, is insufficient to show a centralized control of labor relations. To determine whether two companies share common management, the proper focus is on whether the companies share common officers.  *See McKenzie*, 834 F.2d at 933-34.  Plaintiff has presented no such evidence, but relies only on the parent-subsidiary relationship of the companies.  Because the existence of a parent-subsidiary relationship is not enough to impose liability on the parent, *see Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1364 (10th Cir. 1993); *see also Lyes*, 166 F.3d at 1341, plaintiff has presented no evidence on which a jury could infer that the companies share common management. Plaintiff's recourse to the shared Human Resource handbook and evidence that she appeared on Sonat's payroll is insufficient to show common ownership or financial control.

22

Because plaintiff cannot show that El Paso/Sonat and SNG should be treated as a single

employer, and plaintiff is not an employee of El Paso, El Paso is entitled to judgment as a matter

of law on each of plaintiff's claims.[11]

## C. EQUAL PAY ACT CLAIM

To establish a prima facie case under the Equal Pay Act,[12] an employee must show that

"an employer pays different wages to employees of opposite sexes 'for equal work on jobs the

performance of which requires equal skill, effort, and responsibility, and which are performed

under similar working conditions.'" *Waters v. Turner, Wood & Smith Ins. Agency, Inc.*, 874 F.2d

797, 799 (11th Cir. 1989) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974)).

Under the Equal Pay Act, there is a high standard for determining whether jobs are equal with

respect to skill, effort and responsibility. *Waters*, 874 F.2d at 799. "[A]lthough employees do

not have to prove jobs are identical, they have the heavy burden of proving 'substantial identity

of job functions.'" *Id.* (citing *Hodgson v. Golden Isles Convalescent Homes, Inc.*, 468 F.2d 1256,

1258 (5th Cir. 1972)). Plaintiff cannot establish a prima facie case without showing that the jobs

are "substantially identical or equal." *Waters*, 874 F.2d at 799 (citation omitted). Plaintiff

---

[11] Even if, contrary to the court's holding, El Paso should be treat as a "single employer,"
it is still entitled to judgment as a matter of law to the same extent as SNG.

[12] The Equal Pay Act provides in relevant part that

> [n]o employer . . . shall discriminate . . . between employees on the
> basis of sex by paying wages to employees . . . at a rate less than
> the rate at which he pays wages to employees of the opposite sex .
> . . for equal work on jobs the performance of which requires equal
> skill, effort, and responsibility, and which are performed under
> similar working conditions . . . .

29 U.S.C. § 206(d)(1).

establishes a prima facie case by comparing the skills and qualifications actually needed to perform the jobs rather than the skills and qualifications of individual employees actually holding those jobs. *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th Cir. 1992). The focus is on the primary duties of each job. *Id.* Duties that are incidental, insubstantial, or typically performed by other personnel at lower pay are not germane to the inquiry. *Id.* (citation omitted)

SNG claims that plaintiff cannot establish a prima facie case of wage discrimination under the Equal Pay Act because "plaintiff and Deneke were not performing substantially equivalent jobs." (SNG Brief at 19.) Because Adair began working in the Rates Department in October 1998, (Adair Depo. at 43), and plaintiff concedes that after Adair began working in the Rates Department, plaintiff and Deneke were not performing comparable or similar jobs, (Pl. Depo. at 169-71, 130), plaintiff cannot establish a case of wage discrimination under the Equal Pay Act after October 1998. Therefore, the only period during which plaintiff could possibly establish an Equal Pay Act claim is from September 1996, when Deneke entered the Rates Department, to October 1998.[13]

SNG contends that "[d]uring this time period, plaintiff and Deneke were not performing substantially similar jobs because plaintiff was employed part-time while Deneke was employed full-time." (SNG Brief at 19.) Defendant cites to two cases from the Seventh Circuit, *Ilhardt v. Sarah Lee Corp.*, 118 F.3d 1151 (7th Cir. 1997); *LaRocco v. Nalco Chem. Co.*, 1999 WL 199251

---

[13]Under the Equal Pay Act, a civil action must be initiated two years after the date of violation, or three years if a violation is shown to be willful. 29 U.S.C. § 255(a). Plaintiff's Complaint was filed on July 31, 2000. Therefore, plaintiff could only recover for damages for an Equal Pay Act violation from July 31, 1997 to October 1998 if the violation was found to be willful, or from July 31, 1998 to October 1998 for a non-willful violation.

(N.D. Ill. Mar. 30, 1999). The Seventh Circuit ruled that because "full-time employees are simply not similarly situated to part-time employees," a full-time employee is not an acceptable comparator for a part-time employee seeking to establish a prima facie case of disparate treatment under Title VII. *See Ilhardt*, 118 F.3d at 1155. The court reasoned that there are too many differences between part-time and full-time employees. *Id.* For example, "as illustrated in Ilhardt's case, part-time employees work fewer hours and receive less pay and fewer benefits." *Id.* Like Ilhardt, as a part-time employee, plaintiff worked fewer hours and received less pay and fewer benefits than full-time employees. (*See* Pl. Depo. at 110, 115, 118.) In *LaRocco*, 1999 WL 199251, at *13, the court concluded that a part-time employee could not establish a prima facie of wage or working conditions discrimination under either the Equal Pay Act or Title VII because, during the relevant time period, the only potential comparators were full-time employees. Defendant argues that because plaintiff worked part-time, and identifies no comparator that was also working part-time, plaintiff cannot establish a prima facie case under the Equal Pay Act.

Because the court finds that plaintiff has not established that the actual job duties performed by plaintiff and Deneke were substantially similar, the court will not decide whether part-time status alone would prohibit plaintiff, a part-time employee, from establishing a prima facie case under the Equal Pay Act with a comparator who worked full time. During the period of her employment from 1995 to 1999, plaintiff spent fifty to sixty percent of her time on volume analysis, twenty-five to thirty percent  on revenue analysis, and ten percent on other tasks. (Pl. Depo. at 71-72, 75-77, 119-20.) During his first year of employment beginning in September 1996, Deneke spent approximately forty percent of his time on learning or performing rate

25

design, ten percent on cost of service impacts, twenty percent on competitive analysis, twenty percent on the NARG study, and less than ten percent on volume analysis. (Deneke Depo. at 16-17; Deneke Aff. ¶ 2.) Plaintiff has not presented evidence on which a reasonable jury could infer that the jobs that she and Deneke performed from September 1996 to September 1997 were "substantially identical or equal."

To establish a prima facie case, plaintiff must show that the primary duties of her job are substantially equal to the primary duties of Deneke's job. *Miranda*, 975 F.2d at 1533. Even giving plaintiff the benefit of every reasonable inference, she has not met her burden of showing that the jobs were substantially equal. After his first year at SNG, Deneke worked on the NARG study for approximately eighty percent of the time for some period of time. (Deneke Aff. ¶ 2.) There is no evidence that plaintiff did any work on the NARG study. The following table compares each job function performed by either plaintiff or Deneke and highlights the differences between their duties:

| JOB DUTY | Did plaintiff perform the duty?[14] | Did Deneke perform the duty?[15] |
|---|---|---|
| Volume analysis | Yes. (Pl. Depo. at 71-72.) | Yes. (Deneke Aff. ¶ 2; Deneke Depo. at 27.) |
| Revenue analysis | Yes. (Pl. Depo. at 76.) | Yes. (Deneke Depo. at 27, 57.) |
| Data response | Yes. (Pl. Depo. at 76.) | |
| Hi-low factors | Yes. (Pl. Depo. at 76.) | |
| Penalty studies | Yes. (Pl. Depo. at 76.) | |

[14] Plaintiff performed these duties during the period from 1995 through 1999. (Pl. Depo. at 71-72, 75-77.)

[15] Deneke performed these duties from 1996 through 1999. (Deneke Aff. ¶ 3.)

| Cost analysis | Yes. (Pl. Depo. at 76.) | |
| --- | --- | --- |
| Pipeline expansion studies | Yes. (Pl. Depo. at 76.) | Yes. (Deneke Depo. at 52.) |
| Refunds | Yes. (Pl. Depo. at 76.) | |
| FT discounts | Yes. (Pl. Depo. at 76; Deneke Depo. at 24.) | Yes. (Deneke Depo. at 24.) |
| Tracking demand numbers | Yes. (Pl. Depo. at 77.) | |
| Performing rate design | Not by herself. (Pl. Depo. at 143.)[16] | Yes. (Deneke Aff. ¶ 3.) |
| Compiling information for the rate case | Yes. (Pl. Depo. at 131-32.) | Yes. (Pl. Depo. at 131-32.) |
| Cost of service impacts | Yes. (Pl. Depo. at 29, 33.) | Yes. (Deneke Aff. ¶ 3.) |
| Competitive analysis | No. (Pl. Depo. at 146.) | Yes. (Deneke Aff. ¶ 3; Deneke Depo. at 56.) |
| NARG study | | Yes. (Deneke Aff. ¶ 3.) |
| Cost classification studies | No. (Pl. Depo. at 143.) | Yes. (Deneke Aff. ¶ 3.) |
| Rate design studies | | Yes. (Deneke Aff. ¶ 3.) |
| Tracking gas price movement | No. (Pl. Depo. at 146.) | Yes. (Deneke Aff. ¶ 3.) |
| Depreciation studies | No. (Pl. Depo. at 143-44.) | Yes. (Deneke Aff. ¶ 3 Deneke Depo. at 54.) |
| Mileage impact studies | No. (Pl. Depo. at 144.) | Yes. (Deneke Aff. ¶ 3; Deneke Depo. at 55.) |
| Three-day peak analysis | Yes. (Pl. Depo. at 145.) | Yes. (Deneke Aff. ¶ 3; Deneke Depo. at 56.) |
| I.T. feeder studies | "I don't know what that is." (Pl. Depo. at 146.)[17] | Yes. (Deneke Aff. ¶ 3; Deneke Depo. at 56.) |
| I.T. revenue credit studies | No. (Pl. Depo. at 149.) | Yes. (Deneke Aff. ¶ 3.) |

[16] Viewed in a light most favorable to nonmovant, the court interprets this response as a 'yes.'

[17] Because it is not reasonable to infer that plaintiff performed such a study when she did not even know what it was, the court interprets this response as 'no.'

27

| G.R.I. refunds | "It seems like I did." (Pl. Depo. at 149.)[18] | Yes. (Deneke Aff. ¶ 3; Deneke Depo. at 58.) |
|---|---|---|
| Seasonal rate design studies | Yes. (Pl. Depo. at 150.) | Yes. (Deneke Aff. ¶ 3.) |
| Zone matrix rate design studies | "I provided a monthly report of matrix rates–I mean matrix volumes." (Pl. Depo. at 151.)[19] | Yes. (Deneke Aff. ¶ 3; Deneke Depo. at 58.) |
| Impact studies on selling SNG facilities | No. (Pl. Depo. at 146.) | Yes. (Deneke Aff. ¶ 3; Deneke Depo. at 56.) |
| Preparing/filing testimony for a rate case | No. (Pl. Depo. at 144.) | Yes. (Deneke Aff. ¶ 3.) |
| Performing market demand studies | Yes. (Pl. Depo. at 147.) | Yes. (Deneke Depo. at 57.) |
| Offshore facilities studies | No. (Pl. Depo. at 147.) | Yes. (Deneke Depo. at 57.) |

Of the thirty job duties which either plaintiff or Deneke performed while in the Rates Department, twelve duties were performed by both, ten duties were performed by Deneke but not plaintiff, six duties were performed by plaintiff and there is no evidence indicating whether or not Deneke performed them, and two duties were performed by Deneke and there is no evidence indicating whether or not plaintiff performed them. On these facts, plaintiff has not established that the duties performed by Deneke and her were substantially similar. Therefore, because plaintiff has not offered evidence on which a reasonable jury could find that she and Deneke performed substantially similar jobs in the Rates Department, SNG is entitled to judgment as a matter of law on plaintiff's Equal Pay Act claim.

---

[18] Viewed in a light most favorable to nonmovant, the court interprets this response as a 'yes.'

[19] Viewed in a light most favorable to nonmovant, the court interprets this response as a 'yes.'

28

Even if plaintiff were able to establish a prima facie case under the Equal Pay Act, SNG contends that it has established the affirmative defense that the differential in pay was justified by a factor other than sex. (SNG Brief at 22.) If plaintiff establishes a prima facie case, then "[t]he burden shifts to defendant to prove by a preponderance of the evidence that the differential in pay is justified by one of the four exceptions . . . ." *Mulhall v. Advance Security, Inc.*, 19 F.3d 586, 590 (11th Cir. 1994) (citation omitted). The exceptions are "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1). Defendant must show that "the factor of sex provided *no basis* for the wage differential." *Mulhall*, 19 F.3d at 590. Factors such as experience and education of employees may constitute defenses to liability. *See Miranda*, 975 F.2d at 1533 n.18 (citation omitted).

According to defendant, SNG has a "practice of paying individuals with engineering degrees . . . a higher salary than individuals without such degrees." (SNG Brief at 22.) Grimes testified that because Deneke had an engineering degree, he received a greater starting pay than plaintiff, who had an accounting degree. (Grimes Aff. ¶ 2.) The Eleventh Circuit has recognized that an employee's education may constitute a defense to liability under the Equal Pay Act. *See Miranda*, 975 F.2d at 1533 n.18 (citation omitted). Therefore, unless plaintiff can offer evidence by which a reasonable juror could disbelieve defendant's reason for paying Deneke more than plaintiff, namely Deneke's educational background, defendant is entitled to judgment as a matter of law.

Plaintiff offers evidence which she claims rebuts SNG's affirmative defense. First, she offers the undisputed fact that one does not need an engineering degree to perform the duties of a

Rate Analyst. Adair, who had worked as a Senior Rate Analyst in the Rates Department for two and a half years, testified that to her knowledge there is no job in the Rates Department that one needs an engineering degree to perform. (Adair Depo. at 5, 18.) Sheffield testified that there is no job in the Rates Department that only an engineer could do or would be best suited for. (Sheffield Depo. at 36.) Morgan testified that one needed an accounting, engineering, or mathematics degree to work at the professional level in the Rates Department. (Morgan Depo. at 40.) Outlaw testified that when he worked as a Senior Rate Analyst, there was nothing in his job that he felt he could not do because he lacked an engineering degree. (Outlaw Depo. at 109-10.) Outlaw, who has a mathematics degree, felt qualified for all the positions he held in the Department. (*Id.* at 110.) Second, plaintiff testified that when she complained of the pay disparity, no one told her that Deneke was being paid more because he was an engineer. (Pl. Depo. at 173.) Third, Outlaw, supervisor for Deneke and plaintiff, testified that he did not understand there to be a separate pay scale for engineers. (Outlaw Depo. at 118.)

Assuming as the court must that this evidence is true, it is still insufficient to create a jury question about the legitimacy of defendant's articulated reason for paying Deneke more than plaintiff. SNG can pay engineers more than accountants to perform the same job even if each is equally qualified to perform the job, because it considered such incentives necessary to attract those it considered to be the best qualified employees: engineers. (*See* Grimes Aff. ¶ 2.) *See also Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11 th Cir. 2000) (holding that substituting one's business judgment for that of the employer or quarreling with the wisdom of the employer's decisions is not sufficient to rebut an employer's articulated reason for making a particular employment decision). The lack of knowledge possessed by plaintiff and Outlaw of

SNG's compensation policies is irrelevant, because there is no evidence that either had ever

worked in the Human Resources Department or was otherwise competent to testify about such

matters. Finally, the fact that no agent of SNG told plaintiff why she was being paid less than

Deneke when she complained about it is insufficient to create a jury question on the legitimacy

of SNG's articulated reason for the pay disparity. Because plaintiff failed to make out a prima

facie case of discrimination under the Equal Pay Act, or in the alternative, because plaintiff

failed to present evidence sufficient to call into doubt defendant's reason for paying Deneke

more than plaintiff, SNG is entitled to judgment as a matter of law on plaintiff's Equal Pay Act

claim.

## D. TIMELINESS OF TITLE VII CLAIMS

Before suing for discrimination under Title VII, a plaintiff must first exhaust her

administrative remedies. *See Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001)

(citations omitted). To do so, plaintiff must file a timely charge of discrimination with the

EEOC. *Id.* For a charge to be timely, it must be filed within 180 days of the alleged

discriminatory act. *Wilkerson*, 270 F.3d at 1317. Generally, if the plaintiff fails to file a charge

before this time elapses, the plaintiff's claim is untimely and the plaintiff is procedurally barred

for failure to exhaust her administrative remedies. *See Delaware State College v. Ricks,* 449

U.S. 250, 256 (1980). The plaintiff has the burden of proving all conditions precedent to filing

suit, including the condition that she timely filed an EEOC Charge. *See Maynard v. Pneumatic*

*Products Corp.*, 256 F.3d 1259, 1262 (11th Cir. 2001).

However, under some circumstances, failure to file an EEOC Charge within 180 days of

an adverse employment action does not bar an action. "Under equitable modification, a

31

limitations period does not start to run until the facts which would support a charge of discrimination are apparent or should be apparent to a person with a reasonably prudent regard for his rights." *Sturniolo v. Sheaffer, Eaton, Inc.*, 15 F.3d 1023, 1025 (11th Cir. 1994) (citations omitted). Stated another way, the 180 days "begins running from the date the employee knows or reasonably should know that he or she has been discriminated against." *Hill v. Metro. Atlanta Rapid Transit Auth.*, 841 F.2d 1533, 1545 (11th Cir. 1988). Timing requirements could be equitably tolled if an employee had no reason to believe he was a victim of unlawful discrimination in the period prior to 180 days before filing an EEOC Charge. *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1435 (11th Cir. 1998). "Under equitable tolling, Title VII's statute of limitations does not start to run until a plaintiff knew or reasonably should have known that she was discriminated against." *Carter v. West Publ'g Co.*, 225 F.3d 1258, 1265 (11th Cir. 2000).

The continuing violation exception allows for an extension of the limitations period based on a claim of acts committed under an ongoing policy of discrimination. *See, e.g., Beavers v. American Cast Iron Pipe Co.,* 975 F.2d 792, 796 (11th Cir. 1992). "A claim arising out of an injury which is 'continuing' only because a putative plaintiff knowingly fails to seek relief is exactly the sort of claim that Congress intended to bar by the 180-day limitation period." *Roberts v. Gadsden Memorial Hosp.*, 850 F.2d 1549, 1550 (11th Cir. 1988). In the Eleventh Circuit, the present consequence of a one-time violation occurring more than 180 days before the filing of a charge does not constitute a continuing violation and is not actionable. *See Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 448 (11th Cir. 1993). However, a claim based on a violation which began more than 180 days before a charge is filed that continues into the

32

present constitutes a continuing violation, which is not barred by the limitations period. *See id.* "To revive an otherwise time-barred claim under the doctrine, however, it must be part of a pattern of continuing practice out of which the timely-filed incident arose." *Roberts v. Gadsden Memorial Hosp.*, 835 F.2d 793, 800 (11th Cir. 1988) (citing *United Air Lines v. Evans*, 431 U.S. 553 (1977)). "It is only when a substantial nexus exists between a timely-filed claim and an otherwise time-barred claim that they may be viewed as constituting a single violation, part of which falls within the limitations period." *Roberts*, 850 F.2d at 800. When determining whether such a nexus exists, courts should refer to a variety of factors, such as "subject matter, frequency, and permanence (*i.e.*, whether the act was sufficiently permanent in nature so as to 'trigger an employee's awareness of and duty to assert his or her rights')." *Id.* (quoting *Berry v. Board of Supervisors of L.S.U.*, 715 F.2d 971, 981 (5th Cir. 1983)).

SNG argues that plaintiff's Title VII discrimination claims are due to be dismissed because they are untimely.[20] (SNG Brief at 23.) Plaintiff filed her first Charge on September 16, 1999. (Compl. ¶ 10, Ex. A.) Because, in general, any claim arising out of an act that occurred over 180 days prior to the date of filing, September 16, 1999, is barred, *see Ricks*, 499 U.S. at 256, plaintiff's claims concerning alleged discriminatory acts that occurred before March 20, 1999, are barred unless an exception applies.

1. *Timeliness of Differential Pay Claim*

Defendant argues that plaintiff's Title VII differential pay claim is untimely because "[p]laintiff admits that after October of 1998, she and Deneke did not perform the same job and that she does not allege that she was discriminated against with respect to pay after this time."

---

[20] SNG does not argue that plaintiff's retaliation claim is untimely.

33

(SNG Brief at 23.)  Defendant's argument is without merit.  First, the court's examination of the record reveals no admission by plaintiff that she was not discriminated against with respect to pay after October 1998.  Second, there is no indication that plaintiff knew or had any reason to know that Deneke was being paid more than she was paid until she discovered his pay stub on the copy machine on August 18, 1999.  (*See* Pl. Depo. at 168-69.)  "Under equitable tolling, Title VII's statute of limitations does not start to run until a plaintiff knew or reasonably should have known that she was discriminated against."  *Carter v. West Publ'g Co.*, 225 F.3d 1258, 1265 (11th Cir. 2000).  Therefore, because the statute of limitations on plaintiff's differential pay claim did not begin to run until August 18, 1999, and plaintiff filed her charge less than a month after the statute began to run, plaintiff's Title VII differential pay claim is timely.

### 2. *Timeliness of Claim for Failure to Return to Full-time Work*

Plaintiff claims that she sought to return to full-time work in 1996, in January 1999, March 1999, and May 1999. ((Pl. Aff. ¶¶ 4, 6.)  Because any claim arising out of an act that occurred over 180 days prior to the date of filing, September 16, 1999, is barred, *see Ricks*, 499 U.S. at 256, plaintiff's claims concerning alleged discriminatory acts that occurred before March 20, 1999, are barred unless an exception applies.  Plaintiff's claims arising out of events allegedly occurring in 1996 and January 1999 are time-barred.  Furthermore, plaintiff's claim arising out of events taking place in March 1999 are also time-barred because plaintiff has not met her burden of showing that the allegedly discriminatory act took place on or after March 20, 1999.  Therefore, except for the alleged discrimination occurring in May 1999, these claims are time-barred.

### 3. Timeliness of Claim for Discriminatory Job Assignments

Plaintiff also claims that SNG discriminated against her because "men received the more favorable or higher profile job assignments." (Pl. Aff. ¶ 7.) Plaintiff alleges only one incident involving assignments for the rates case. (*See* Pl. Depo. at 193.) Because there is no indication when any allegedly discriminatory job assignment took place, plaintiff has not met her burden of showing that the allegedly discriminatory act took place on or after March 20, 1999. Therefore, any discriminatory job assignment claim is time-barred.

## E. TITLE VII SUBSTANTIVE STANDARDS

### 1. Disparate Treatment Claims

In any action alleging disparate treatment by an employer, the plaintiff must prove that the employer acted with a discriminatory motive. *International Bhd. of Teamsters v. United States,* 431 U.S. 324, 335 n.15 (1977). The plaintiff may prove her claim through the introduction of direct or circumstantial evidence. *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999). Direct evidence of discrimination is "evidence which, if believed, would prove the existence of a fact [in issue] without inference or presumption." *Bass v. Bd. of County Comm'rs*, 256 F.3d 1059, 1105 (11th Cir. 2001) (citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)).

Because plaintiff offers no direct evidence of discrimination, the court's analysis is governed by the familiar framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1527-28 (11th Cir. 1997) (clarifying the standard to be applied under Eleventh Circuit jurisprudence). Under

35

this framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *Burdine*, 450 U.S. at 252-53.

If the plaintiff successfully establishes a prima facie case, the burden of production shifts to the defendant "to articulate a legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas*, 411 U.S. at 802. Defendant's burden to rebut the presumption created in such a situation is one of production rather than proof, requiring defendant to articulate a legitimate, nondiscriminatory reason for its action. *Burdine*, 450 U.S. at 257-58.

If the defendant succeeds in carrying this burden, then any "presumption of discrimination created by the *McDonnell Douglas* framework drops from the case, and the factual inquiry proceeds to a new level of specificity." *Combs,* 106 F.3d at 1528 (quotation omitted). The plaintiff must then prove that the defendant's articulated reasons are a mere pretext for unlawful motives (i.e., discrimination). *Id*. If plaintiff does not offer evidence to allow a fact finder to disbelieve the employer's proffered explanation for its actions, defendant is entitled to summary judgment. *See Chapman v. AI Transport*, 229 F.3d 1012, 1025 n.11 (11th Cir. 2000). At all times, the plaintiff bears the burden of persuasion on the ultimate question of whether the defendant acted with an unlawful motive. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

To avoid summary judgment, plaintiff must submit sufficient nonconclusory evidence that defendant's articulated legitimate reasons were pretextual. *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471-72 (11th Cir. 1991); *Carter v. City of Miami*, 870 F.2d 578, 585 (11th Cir. 1989). Plaintiff must put forth concrete evidence that casts sufficient doubt on defendant's proffered reasons such that a reasonable fact finder could conclude that those reasons did not

36

actually motivate the employment decisions. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148 (2000); *Combs,* 106 F.3d at 1538; *Earley v. Champion Int'l. Corp.,* 907 F.2d 1077, 1083-84 (11th Cir. 1990).

    *2. Retaliation Claims*

    In order to establish a prima facie case of unlawful retaliation in violation of Title VII, plaintiff must show: (1) that she engaged in statutorily protected expression; (2) that she experienced an adverse employment action; and (3) a causal link between the protected expression and the adverse action. *See Sullivan v. Nat'l R.R. Passenger Corp.,* 170 F.3d 1056, 1059 (11th Cir. 1999) (citation omitted). Once a prima facie case has been established, the defendant must come forward with legitimate, nonretaliatory reasons for the employment action. *Id.* If the defendant offers legitimate reasons for the employment action, the burden shifts back to the plaintiff to prove that the reasons offered by the defendant are pretextual. *Id.*

## F. LIABILITY FOR DISPARATE TREATMENT

    Plaintiff claims that female employees at SNG "are treated differently in comparison to their male counterparts due to their gender." (Compl. ¶ 33.)

    *1. Differential Pay Claims*

    Failure to establish a prima facie case under the Equal Pay Act does not preclude plaintiff from bringing a wage discrimination claim under Title VII. *See Miranda,* 975 F.2d at 1527-28. The *McDonnell Douglas/Burdine* framework is the appropriate framework for evaluating plaintiff's gender-based wage discrimination claim under Title VII. *See id.,* 975 F.2d at 1528. To establish a prima facie case of gender-based wage discrimination under Title VII, plaintiff must show "that she is a female and that the job she occupied was similar to higher paying jobs

occupied by males." *See id.*, 975 F.2d at 1529.  In contrast to the "fairly strict standard of proving that she performed substantially similar work for less pay" to establish a claim under the Equal Pay Act, under Title VII, "there is a relaxed standard of similarity between male and female-occupied jobs." *See id.*, 975 F.2d at 1526.  Plaintiff need not meet the exacting standard of substantial equality of position set forth in the Equal Pay Act to make out her Title VII claim. *See id.*, 975 F.2d at 1529 n.15.  Plaintiff must show only that she performed "the same type of tasks" for less pay than a male comparator. *See id.*, 975 F.2d at 1529.

   Even if plaintiff could establish a prima facie case, defendant has articulated a legitimate nondiscriminatory reason for paying Deneke more than plaintiff:  SNG 's "practice of paying individuals with engineering degrees at a higher salary than individuals without such degrees." (SNG Brief at 22.)  "In recruiting and attracting who SNG considers to be the best qualified employees, SNG attempts to offer competitive salaries.  The starting salaries for recent graduates with engineering degrees, MBAs, and law degrees, are generally higher than that of individuals with accounting degrees." (Grimes Aff. ¶ 2.)  Grimes testified that because Deneke had an engineering degree, he received a greater starting pay than plaintiff, who had an accounting degree.  (*Id.*)  Title VII incorporates "the affirmative defenses from the Equal Pay Act." *Miranda*, 975 F.2d at 1528.  Therefore, this justification for the pay difference is as legitimate a defense to plaintiff's Title VII claim as it is to her Equal Pay Act claim.  Unless plaintiff can offer evidence by which a reasonable juror could disbelieve defendant's reason for paying Deneke more than plaintiff, namely Deneke's educational background, defendant is entitled to judgment as a matter of law.

Although plaintiff offers evidence which she claims rebuts SNG's legitimate, nondiscriminatory reason for the difference in pay, the court concludes that it is insufficient to create a jury question about the legitimacy of defendant's articulated reason for paying Deneke more than plaintiff. *See supra*, at 29-31. Because plaintiff has offered no evidence by which a reasonable jury could infer that SNG's articulated reason for paying Deneke more than plaintiff is pretext for unlawful gender discrimination, SNG is entitled to judgment as a matter of law on plaintiff's Title VII gender-based wage discrimination claim.

### 2. Failure to Return to Full-time Work Claim

Plaintiff claims that she sought to return to full-time work in May 1999 when Adair went on maternity leave. (Pl. Aff. ¶ 6.)[21] SNG contends that plaintiff has not established a prima facie case because "she has failed to identify a specific full-time vacancy that she was not awarded." (SNG Brief at 25.) Plaintiff, on the other hand, contends that George, a male, was awarded a position as Principal in the Rates Department. (Pl. Brief at 26.)

Even assuming a prima facie case, SNG has articulated a legitimate, nondiscriminatory reason for the failure to return her to full-time work. In March 1999, two months before plaintiff's only request to return to full-time work that is not time-barred, El Paso announced a merger with Sonat, SNG's parent company. (Matthews Aff. ¶ 2.) Following the announcement of the merger, there was a general freeze on employee status changes. (*Id.* ¶ 3.) El Paso management and Sonat management "agreed that, absent the mutual consent of the two companies, the employment status of employees was not to be changed." (*Id.*) As a result, "no

---

[21] Plaintiff's other failure to return to full-time work claims are time-barred. *See supra*, at 30.

part-time employees could change to full-time employment without a business reason that could be agreed upon by both companies." (*Id.*)  Matthews testified that to her knowledge, no employee in the Rates Department had his or her status changed from part-time to full-time. (*Id.*)

Plaintiff contends that this reason is pretext because Gandy was allowed to move from part-time to full-time work after the merger was announced.  (Pl. Brief at 26.)  This argument is without merit.  The general freeze on employment changes could be overridden by the mutual consent of El Paso and Sonat.  (Matthews Aff. ¶ 3.)  It is undisputed that El Paso and Sonat mutually agreed to the change in Gandy's employment status.  (Parker Aff. ¶ 4.)  Because plaintiff offers no evidence by which a reasonable juror could question the veracity of SNG's articulated reason for failing to return plaintiff to full-time work, SNG is entitled to judgment as a matter of law on this claim.

### 3. Discriminatory Job Assignments Claims

Plaintiff also claims that SNG discriminated against her because "men received the more favorable or higher profile job assignments." (Pl. Aff. ¶ 7.)  Even if this claim were not time-barred, plaintiff has not established a prima facie case.  Plaintiff alleges only one incident involving assignments for the rates case. (*See* Pl. Depo. at 193.)  According to plaintiff, when she asked to participate on the rates case, Outlaw told her that the work she had been assigned fit her fifty-percent part-time schedule and that he was going to leave it as it was.  (Pl. Depo. at 193.)  Plaintiff has not established a prima facie case because she did not identify a similarly situated male comparator, one who was a part-time employee, who was assigned the job or jobs

40

that plaintiff desired. *See Ilhardt*, 118 F.3d at 1155 (part-time employees are not similarly situated to full-time employees).

Even if plaintiff had established a prima facie case, she has offered no evidence that Outlaw's articulated reason for his assignments were pretext for unlawful discrimination. According to Outlaw, plaintiff rarely completed her assigned duties early. (Outlaw Depo. at 127.) Outlaw did not believe that plaintiff was capable of handling the work that was assigned to Deneke. (*Id.* at 99.) A supervisor's subjective belief that an employee is unable to handle a work assignment is a legitimate reason for not assigning the job to that employee.

Plaintiff seeks to support her claim on the basis of Alsobrooks's testimony that she "had heard Mr. Meyers make a statement when making an assignment to a man that he could count on him because he would not have to leave early for his children . . . ." (Alsobrooks Aff. ¶ 4.) Alsobrooks's reported observation is insufficient to create a question of fact for a jury. First, because Alsobrooks does not say when the statement was made, there is no way to tell whether it is relevant to plaintiff's claim. Second, Outlaw, rather than Meyers, denied plaintiff's request for the rates case assignment. Therefore, SNG is entitled to judgment as a matter of law on plaintiff's discriminatory job assignments claim.

## G. LIABILITY FOR RETALIATION

In order to establish a prima facie case of unlawful retaliation in violation of Title VII, plaintiff must show: (1) that she engaged in statutorily protected expression; (2) that she experienced an adverse employment action; and (3) a causal link between the protected expression and the adverse action. *See Sullivan*, 170 F.3d at 1059 (citation omitted). It is undisputed that plaintiff meets the first two prongs of the test. First, on September 5, 1999,

plaintiff complained to her supervisor, Outlaw, about the allegedly discriminatory disparity in pay. (Pl. Depo. at 172-73; Outlaw Depo. at 112-13.) On September 16, 1999, plaintiff filed an EEOC Charge against SNG. (Compl. ¶ 10, Ex. A.) On September 29, 1999, plaintiff's attorney sent a letter to SNG's General Counsel informing him of plaintiff's gender discrimination claim against SNG. (PX 35.) Because both the filing of formal complaints of discrimination and informally voicing complaints of discrimination constitute protected activity, *see Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989), plaintiff engaged in statutorily protected expression. Second, because plaintiff was terminated on October 29, 1999, (Pl. Aff. ¶ 2), she undoubtedly suffered adverse employment action.

Defendant, however, contends that plaintiff "cannot demonstrate the third element that the protected activity and the adverse employment action are causally related." (SNG Brief at 28.) In order to show that there is a causal link, "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *EEOC v. Reichhold Chemicals, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993) (citations omitted). Plaintiff must establish that the decisionmaker was actually aware of the protected expression when it took the adverse employment action. *Griffin v. GTE Florida, Inc.*, 182 F.3d 1279, 1284 (11th Cir. 1999); *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999) (citation omitted). Such awareness may be established by circumstantial evidence. *Id.* "[A]wareness by decision-maker of protected conduct, in conjunction with temporal proximity of adverse employment action to protected conduct, is sufficient to create a factual issue about the causal link requirement." *Id.* (citing *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163-64 (11th Cir. 1993)).

SNG argues that plaintiff cannot meet this burden because "the decision to eliminate the part-time Staff Rate Analyst [position] was not made by anyone in the Rates department at SNG" and because of a lack of evidence "that any individual involved in the decision to eliminate the [position] was aware of [plaintiff's] complaints to Outlaw about her pay or her EEOC charge." (SNG Brief at 29.)

Viewing the evidence in the light most favorable to plaintiff, the court finds SNG's argument unpersuasive. First, at oral argument, defendants' counsel acknowledged that the identity of the individuals who decided to eliminate plaintiff's position was not divulged to plaintiff in initial disclosures. Although defendants' counsel argued that the identity of these individuals was made clear in discovery, there is no *evidence* before the court as to the identity of the decisionmakers. Second, instead of offering testimony from the decisionmakers themselves that they were unaware of plaintiff's protected activity, SNG offers only Matthews's testimony that "[t]o [her] *knowledge*, none of the individuals involved in [the decision to eliminate the part-time Rate Analyst position] were aware of plaintiff's Charge of Discrimination or complaint to Darryl Outlaw or anyone else regarding pay." (Matthews Aff. ¶ 7 (emphasis added).) Notably Matthews does not deny that the decision-makers were aware of the letter sent by plaintiff's attorney to SNG's General Counsel informing him of plaintiff's allegations of gender discrimination. Matthews's testimony is of little probative value, because it states no basis for her opinion and provides no indication that she is competent to testify about the decisionmakers' subjective awareness of plaintiff's actions. Particularly, she does not state that the decisionmakers told her that they were unaware of plaintiff's protected activity. Construing

reasonable inferences in plaintiff's favor, Matthews's Affidavit simply indicates that she does not know whether or not the decisionmakers knew of plaintiff's protected conduct.

Without evidence of the decisionmakers' awareness or lack of awareness of plaintiff's protected activity, the court finds sufficient evidence to infer that the decision to terminate plaintiff resulted from SNG's awareness of her protected activity. Plaintiff's position with SNG was eliminated on October 29, 1999, less than two months after plaintiff complained to Outlaw, one month after Pope received the letter informing him of plaintiff's allegations, and just over two weeks after SNG received Notice of plaintiff's EEOC Charge. (Pl. Aff. ¶ 2; Pl. Depo. at 172-73; Outlaw Depo. at 112-13; Matthews Aff. ¶ 9.) Also, less than a month after plaintiff complained to Outlaw about the disparity in pay, Outlaw completed a negative performance review of plaintiff. (*See* Outlaw Depo. at 140; PX 29 at 1.) Such proximity between plaintiff's complaint and Outlaw's negative review of plaintiff is sufficient to create a factual issue as to whether Outlaw's review was biased. One month after Outlaw completed the performance review, plaintiff's position was terminated. (*See* Pl. Aff. ¶ 2.) Because SNG admits that "employees with the higher overall performance reviews were considered the most capable to employ . . . ," (Matthews Aff. ¶ 5), a reasonable jury could infer that the negative performance review impacted on SNG's decision to terminate plaintiff.

Causation may be established "if the plaintiff shows that the decisionmaker followed the biased recommendation without independently investigating the complaint against the employee." *Stimpson v. City of Tuscaloosa,* 186 F.3d 1328, 1332 (11th Cir. 1999). Because there is no evidence that the decisionmakers performed such an independent investigation, plaintiff has proffered sufficient evidence by which a reasonable jury could infer that a prima

facie case of retaliation has been established, and Matthews's Affidavit testimony is insufficient to show that the SNG employees that decided to eliminate plaintiff's position were unaware of her protected activity or that they did not rely on Outlaw's less-than-favorable review. Therefore, the court finds that plaintiff has established a prima facie case of retaliation.

SNG presents a legitimate, nonretaliatory reason for terminating plaintiff. SNG claims that "[t]he part-time Staff Rate Analyst job [held by plaintiff] was eliminated as part of the El-Paso-SONAT merger." (SNG Brief at 29; *see* Matthews Aff. ¶ 7.) Neither plaintiff nor the other employees in the Rates Department whose jobs were eliminated were offered other positions at SNG. (*Id.*) SNG essentially contends that the elimination of the position held by plaintiff had nothing to do with plaintiff's performance, but was simply the result of the merger. Plaintiff argues that there is evidence by which a reasonable juror could infer that SNG's articulated reason for terminating plaintiff was pretext for retaliation, because SNG found new positions for Upchurch, Gandy, and George - the other employees whose positions were eliminated.

As part of the merger process, the part-time Strategic Planning Analyst job held by Upchurch was eliminated. (Matthews. Aff. ¶ 7.) Although Upchurch has not been employed by SNG since the merger, (*id.*), she has been retained on a contract basis through Kelly Services, (Sheffield Depo. at 136). The fact that Upchurch has performed services for SNG as an independent contractor following the merger is not sufficient to infer that SNG retained her after the merger.

Following the announcement of the merger, Jackson, a supervisor in the IT Department, told Parker, Vice-President of Customer Service, that "the dedicated technical assistance provided by IT to the Customer Services Department for its external customers would not exist

when SNG became a subsidiary of El Paso." (Parker Aff. ¶¶ 1, 3.) Jackson told Parker that, to the extent that the Customer Services Department needed an employee dedicated to providing assistance to external customers, it needed to place an employee in the Customer Services Department. (*Id.* ¶ 3.) At this time, Gandy, an employee in the IT Department, was already spending the vast majority of his time assigned to the Customer Services Department to provide assistance. (*Id.*) Parker decided the Customer Services Department needed to continue to provide assistance to its external customers and needed a full-time employee to do so. (*Id.* ¶ 4.) Parker thought Gandy was best qualified for the position because he had worked on the system for months, assisted with its installation, and performed in the help-desk capacity. (*Id.*) Although Gandy's position, like that of plaintiff, was terminated as a result of the merger, and SNG placed him in a new position, his situation is clearly distinguishable from that of plaintiff. Because of structural changes resulting from the merger, the Customer Services Department needed a full-time employee to serve in a capacity for which Gandy was uniquely qualified as a result of his prior service in that capacity. Gandy's situation does not create a question of fact as to SNG's articulated reason for not retaining plaintiff.

Prior to the merger, Brian George worked as a full-time Senior Financial Analyst in the Corporate Planning and Development Department. (Matthews Aff. ¶ 8.) Like plaintiff, as part of the merger, his job was eliminated. (*Id.*) Unlike plaintiff, however, George was placed in the position of Principal in the Rates Department, a vacant position that had not been eliminated as part of the merger. (*Id.*) SNG argues that the situation involving George is distinguishable from that of plaintiff. According to Matthews, George was placed in the vacant position because Cleary and Yardley "were impressed with [George's] job performance and did not want him to

leave" SNG. (*Id.*)  According to Matthews, George "was considered best qualified for [the job] based on his MBA degree, prior analytical job experience as a Senior Financial Analyst, strong past job performance, and as a result of the high opinion of Brian George's job performance held by Mr. Cleary and Mr. Yardley." (*Id.*)  Effective December 1, 1999, George became a Principal in the Rates Department.  (*Id.*)

SNG essentially argues that plaintiff is not similarly situated to George, because of Cleary and Yardley's high opinion of George and desire to retain him despite the elimination of his position resulting from the merger.  However, the only evidence SNG offers as to Cleary and Yardley's opinion of George is Matthews's testimony that they "were impressed with" and had a "high opinion" of George. (*See id.*)  This testimony, however, is inadmissible.  First, Matthews's affidavit provides no basis for inferring that Matthews is competent to testify as to the subjective opinions of Cleary and Yardley.  Second, Matthews's affidavit provides no factual basis supporting Matthews's allegations as to the opinions of Cleary and Yardley.  Third, there is no indication that Matthews's testimony as to the opinions of Cleary and Yardley is based on personal knowledge other than the blanket statement that the affidavit is based on Matthews's personal knowledge. (*See id.* ¶ 1.)  *See also Pace*, 283 F.3d at 1278 (blanket statement that affiant has personal knowledge of facts is not sufficient to bring affidavit within Rule 56(e)'s requirement that it be based on personal knowledge).  In the absence of admissible evidence that Cleary and Yardley actually had such a high opinion of George, a reasonable juror could find defendant's articulated reason for retaining George and not retaining plaintiff is a pretext and that the real reason was retaliation.  *Walker v. Prudential Property and Cas. Ins. Co.*, 286 F.3d 1270, 1274 (11th Cir. 2002) ("If pretext is established, summary judgment in favor of the

defendant is generally inappropriate." (citing, *inter alia, Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 148 (2000)).  Therefore, SNG is not entitled to judgment as a matter of law on plaintiff's retaliation claim.

## IV. CONCLUSION

For the reasons stated herein, the court is of the opinion that defendant El Paso's motion for summary judgment is due to be granted and defendant SNG's motion for summary judgment is due to be granted in part and denied in part.  Defendant SNG's motion is due to be granted with respect to the Equal Pay Act claims and the Title VII disparate treatment claims and due to be denied with respect to the Title VII retaliation claim.  An Order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

DONE this ___30th___ day of September, 2002.

Sharon Lovelace Blackburn
**SHARON LOVELACE BLACKBURN**
United States District Judge

48